IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MYRA DEGERSDORFF | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Civil Action No. _____ |
| | § | |
| | § | |
| THE RITZ-CARLTON | § | JURY TRIAL DEMANDED |
| HOTEL COMPANY, LLC | § | |
| | § | |
| Defendant. | § | |

PLAINTIFF'S ORIGINAL COMPLAINT

Myra deGersdorff files this Original Complaint against The Ritz-Carlton Hotel Company,
LLC ("Ritz-Carlton").

NATURE OF THE CASE

1.      This is an employment discrimination and equal rights lawsuit brought against
Ritz-Carlton under the Civil Rights Act of 1964, as amended 42 U.S.C. §§ 2000e et seq. ("Title
VII").

2.      Ms. deGersdorff files this lawsuit because Ritz-Carlton has maintained a
discriminatory workplace in which she and other females were consistently subjected to different
and higher standards of conduct than their male counterparts.  In addition to Ritz-Carlton's
pattern and practice of disparate treatment of women, in 2008, Ritz-Carlton fabricated violations
of its conduct policy as a pretext to terminate Ms. deGersdorff's nineteen year employment with
the company so that they could replace her with a male employee.

## PARTIES

3.    Ms. deGersdorff is an individual currently residing in Sedona, Arizona.   Ms. deGersdorff may be served with any supplemental pleading or paper through her counsel Randall J. Meyer, 337 Carondelet St., New Orleans, LA 70181.

4.    Ritz-Carlton is a limited liability company organized under the laws of Delaware with its principal place of business in Maryland.   Ritz-Carlton may be served with process through its registered agent: The Prentice-Hall Corporation System, Inc. 320 Somerulous Street, Baton Rouge, LA 70802-6129.

## JURISDICTION

5.    This Court has subject matter jurisdiction over Ms. deGersdorff's Title VII claim under 28 U.S.C. §§ 1331 and 1343, because they arise under the laws of the United States and are brought to recover damages for deprivation of equal rights.

6.    Ms. deGersdorff has exhausted her administrative remedies before filing this lawsuit.   On March 25, 2009, Ms. deGersdorff filed a Charge with the Equal Employment Opportunities Commission.   On June 16, 2011, the EEOC provided her with a Notice of Right to Sue.  Plaintiff requests a trial by jury.

## VENUE

7.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b), (c) and 42 U.S.C. § 2000e-5(f)(3), Ritz-Carlton has offices, conducts business, and can be found in this district, and the causes of action arose and the acts and omissions complained of occurred there.

## RELEVANT FACTS

8.     In 1989, deGersdorff was recruited by Ritz-Carlton away from her position at the Willard Hotel in Washington D.C.  Ritz-Carlton hired Ms. deGersdorff as the Director of Human Resources in its new hotel in Pentagon City, also in Washington D.C.

9.     By 2008, Ms. deGersdorff had been an executive with Ritz-Carlton for over nineteen years. Ms. deGersdorff's leadership at Ritz-Carlton's hotels in Philadelphia, Washington D.C., Kansas City, and then finally in New Orleans was consistently successful.   Ms. deGersdorff made a reputation for turning around ailing Ritz-Carlton hotels and making them profitable through clear-eyed decision-making and a keen business acumen.  With the exception of a brief tenure with a small luxury airline project, Ms. deGersdorff worked continuously for Ritz-Carlton throughout this nineteen-year period.

10.    In 2006, Ms. deGersdorff accepted the position as General Manager of the three Ritz-Carlton operations in New Orleans.  Her immediate predecessor was given the title of "Area Manager" indicating he was ultimately responsible for a number of different properties in the same region.  Though Ms. deGersdorff was offered the same responsibilities as her predecessor, Mr. Ezzat Coutry ("Coutry"), the Senior Regional Vice President for the Southeastern United States, her new supervisor, denied her the title of Area Manager, and asked her to fill the position of General Manager.  Though Ms. deGersdorff accepted the same position of authority over three Ritz-Carlton properties as he male predecessor, she was only allowed a title that implied she somehow held less responsibility.

11.    Shortly after Ms. deGersdorff arrived in New Orleans, Hurricane Katrina decimated the city.  Because of the storm, many staff and guests were unable to evacuate.  Left to care for over 1200 guests and staff during the period of flooding and chaos that followed the

Hurricane, Ms. deGersdorff established a care center in one of her hotel's food and beverage outlets, provided security against criminal elements that were violently looting the hotel's location on Canal Street in the French Quarter and proactively moved her guests and employees to higher, safer ground. In the hurricane's aftermath, Ms. deGersdorff, with the aid of the local police, made the decision to use medical supplies from an abandoned drug store across the street from her hotel and implemented a disinfection system that prevented disease from spreading through the hotel.  For her bold actions, Ms. deGersdorff won the Ritz-Carlton President's Award and was commended by a number of her superiors.

12.     Until she was transferred to work with Mr. Coutry, Ms. deGersdorff received no formal disciplinary actions for her behavior in her previous sixteen years with Ritz-Carlton. However, beginning in June 2006, soon after transferring into Mr. Coutry's jurisdiction, Ms. deGersdorff noticed she was being treated differently than her male counterparts.  One evening, Ms. deGersdorff, while out after dinner, asked members of her sales team to join her for a cocktail. When one of the supervisors declined, she said light-heartedly "Come on Michael. Come out with us. Don't be a pussy." This comment did not seem out of place to Ms. deGersdorff because her male colleagues and superiors regularly used identical crude, offensive language to emphasize a point and deal with each other casually.  However, after this occasion, Ms. deGersdorff was quickly summoned to Ritz-Carlton headquarters where Mr. Coutry erroneously told her that "even my male friends don't talk like that," thus giving an immediate indication that men could speak in a different manner than Ms deGersdorff.  Mr. Coutry gave Ms. deGersdorff a written warning for language that he knew other male managers, including himself, used on a regular basis.  Indeed, each of her sales managers that were present during this

incident later stated that they regularly heard others say much worse on the sales floor and that they were not offended.

13.     Ms. deGersdorff continued to excel and her prominence in the local New Orleans community grew accordingly.  Ms. deGersdorff developed many close business relationships by using her prerogative as General Manager to provide complimentary food and beverage to prospective guests.  As a result, she was invited to be part of the New Orleans Wine & Food Experience, French Quarter Marigny Historic Area Management Board of Directors, and the elite Men & Women of Fashion all of which added to the prestige of the Ritz-Carlton hotels and aided in drawing more business to the hotel.  Ms. deGersdorff was awarded the prestigious Silver Plume award by *Where Magazine*, voted by concierge, guests, and employees as the embodiment of the hospitality leader.  As a result, during the fiscal year prior to her termination, Ms. deGersdorff was the only General Manager in the entire Ritz-Carlton Company whose properties achieved their scheduled budget.

14.     In September/October, 2008, a Ritz-Carlton employee allegedly made an anonymous report to the Ritz-Carlton hotline claiming that Ms. deGersdorff abused her privileges at the Ritz-Carlton bar.  These charges were false.  On December 30, 2008, over two months after the report supposedly occurred, Mr. Coutry called Ms. deGersdorff to inform her of the complaint, and sent Ms. deGersdorff a written warning via e-mail explaining that she had abused company assets. Mr. Coutry's choice of immediate written discipline was extremely unusual.  Normally, under Ritz-Carlton's disciplinary procedures, senior level management can expect a verbal warning to allow them the opportunity to adjust their behavior.  Ms. deGersdorff's predecessors at the New Orleans property and colleagues throughout the Ritz-Carlton system regularly use the food and beverage outlets, including the bar, to entertain guests

and develop business for the hotel. In fact, Ms. deGersdorffs use of the hotel facilities was significantly more modest than her predecessors from only a few years before. Ms. deGersdorff explained that these allegations of abuse of her privileges were false, but was quickly disregarded by Mr. Coutry who said flatly, "we'll talk about this later." When Mr. Coutry visited the New Orleans property one month later to give Ms. deGersdorff her annual performance evaluation, Ms. deGersdorff came prepared with copies of receipts from the hotel's bar showing which items she had charged towards business development, and the items she had paid for personally. Mr. Coutry would not even look at the documents and said only that a Regional Director of Human Resources would be in soon to investigate another anonymously reported allegation.

15. Three days later, Kevin Richeson, Mr. Coutry's Regional Vice President of Human Resources, arrived to investigate allegations of misuse of company property and inappropriate conduct that had been made about a Halloween party she threw at her home as an awards banquet for hotel management. Ms. deGersdorff provided Mr. Richeson with the receipts and documentation regarding her earlier written discipline that Mr. Coutry had refused to see. In a short period of one week, Ms. deGersdorff was receiving more disciplinary action for her "attitude" than she had ever received during her nineteen years with the company. In the end, Ms. deGersdorff was given a written warning for making a comment made in a closed door steering committee meeting. Ms. deGersdorff, in referring to a mannequin that had been costumed for the Halloween Party was accused of light-heartedly saying that the half-costumed mannequin would not be given a "strap-on tool," and would be fully-clothed for the party. This statement was in the context of what would be appropriate attire for the party, and Ms. deGersdorff followed this statement with directives to keep costumes appropriate, conservative,

and for those who didn't celebrate Halloween, were completely optional. Indeed, Ms. deGersdorff's language referring to a "strap-on tool" was used as an example of what not to do at the party, but was nonetheless considered to be offensive by Ritz-Carlton.

16. When Mr. Richeson completed the investigation, he made the following observations: 1) Ms. deGersdorff did not misuse company property; 2) Ms. deGersdorff did not behave inappropriately at the Halloween party; and 3) Ms. deGersdorff did not discriminate against employees who do not celebrate Halloween. Even further, Mr. Richeson noted that two other male managers had committed serious misconduct during the party. One of those male managers had already received written discipline earlier that year. However, he did not receive disciplinary action for what Ritz-Carlton admitted to be inappropriate behavior, and he was allowed to remain employed with Ritz-Carlton.

17. In Ms. deGersdorffs nineteen year career with Ritz-Carlton, she has known hundreds of General Managers, Area Managers, Regional Vice-Presidents, Senior Vice Presidents, and senior Ritz-Carlton leaders. In those nineteen years, she has seen and heard comments, stories, pictures, and expletives that are all significantly more abrupt and offensive than the words she chose to use. She has seen General Managers wear t-shirts to corporate events with expletives written in bold letters, without receiving any form of discipline. She has heard Mr. Coutry himself swear when he becomes agitated or is attempting to make an emphatic point. She has specific recollections of male executives screaming expletives at hourly employees in front of guests, of male executives who Ritz-Carlton knew were publicly fondling female associates, and of male executives who parade themselves as excessively drunk at company functions, all without repercussion or discipline. Ms. deGersdorff was held to a different standard than her male counterparts, male subordinates, and male supervisors.

Officially, Ritz-Carlton claims she was terminated for receiving a second disciplinary counseling in one twelve-month period. However, the Ritz-Carlton leadership decided to give Ms. deGersdorff written discipline for the same behavior for which her male counterparts had become infamous. Ms. deGersdorff was held to a standard higher than her male colleagues or male supervisors thereby preventing yet another female General Manager from advancing through the ranks of Ritz-Carlton leadership.

18.     Ritz-Carlton not only specifically targeted Ms. deGersdorff for sexual discrimination by subjecting her to a different standard than her male counterparts, subsequent events demonstrate that Ritz-Carlton did so because it wanted to replace her with a less capable male employee. Immediately after Ms. deGersdorff's termination, Ritz-Carlton replaced her with a close personal friend of Mr. Coutry, Russell Miller. Mr. Miller directed a Ritz-Carlton project in the Caribbean to which Mr. Coutry had recruited him, but was later closed because of a poor economy. With Mr. Miller left without a formal position in Ritz-Carlton, Mr. Coutry orchestrated Ms. deGersdorff's termination to provide a chance for Mr. Miller to become the Area Manager of the New Orleans hotels.

19.     Once Mr. Miller assumed management responsibility at the New Orleans Ritz-Carlton, Ritz-Carlton immediately began applying the loose conduct standards available to men in the company instead of the rigid standards applied to Ms. deGersdorff. By way of example, on June 2, 2009, Mr. Miller directed Ritz-Carlton employees to load hotel furniture and furnishings, enough to fill the back of five pick-up trucks, to deliver to his private New Orleans home. Hotel employees immediately placed calls to the "hotline" in the first week of June. Ritz-Carlton ignored these employee complaints for almost two months, which prompted those employees to send a letter and several pictures to Ritz-Carlton Corporate Officers. Similar to

Ms. deGersdorffs case, Mr. Richeson was dispatched to the hotel on August 6 and 7, 2009, to conduct an investigation. However, Russell Miller's investigation was significantly more lenient than Ms. deGersdorffs investigation a few months earlier:

- Unlike Ms. deGersdorffs investigation, Russell Miller was not asked to leave the property while the investigation was being conducted. He was allowed to remain on property and speak with those involved in the investigation.

- During Russell Miller's investigation, Mr. Richeson arrived mid-day on Thursday, August 6, 2009, with a departure the next morning. During this short time, Mr. Richeson did not speak with all the employees named in the letter and only investigated Mr. Miller's misuse of company furniture. In contrast, Ms. deGersdorffs investigation lasted almost a full week.

- Ms. deGersdorffs investigations were started by "anonymous" reports and then expanded by Mr. Richeson to include anything that might be considered misconduct. Mr. Miller's investigation, on the other hand, was limited to only one of the four complaints that were raised in the anonymous report.

Despite the fact that Mr. Miller did not have authorization to take hotel furniture, that such conduct is grounds for immediate termination, and may have constituted a crime, Mr. Russell was simply allowed to return the furniture to the hotel without further discipline. Ritz-Carlton's treatment of Mr. Miller demonstrates not only that Ms. deGersdorff was singled out for termination because she was woman, but that male and female general managers are disciplined under two completely different standards.

     20.    In addition to Ritz-Carlton's failure to appropriately discipline Mr. Miller, his performance as the Area Manager of the Ritz-Carlton New Orleans, demonstrates that gender rather than merit, drove Ritz-Carlton's decision making. While Ms. deGersdorff managed the Ritz-Carlton New Orleans, that hotel either equaled or out-performed the other Ritz-Carlton hotels. Since, Mr. Miller has taken over as manager, the employee and customer ratings of the Ritz-Carlton New Orleans have slipped well below company standards. Mr. Miller, however has been allowed to retain his employment.

21.    Ms. deGersdorff's case is an unfortunate microcosm of Ritz-Carlton's systematic mistreatment of woman who seek to work up through the ranks of its hotels.  In the United States, 55% of the graduates from hotel management schools are women.  Over 30% of luxury hotels  are led by women (the percentage for all hotels is significantly higher).  However, only 7% of Ritz-Carlton hotels are led by women.  An even more shameful proportion are allowed to rise to the corporate executive strata.  Clearly there are trained and capable women who work in leadership positions in the luxury hotel industry.  Ritz-Carlton however, systematically elects not to hire them or takes steps to prevent them from obtaining or maintaining leadership positions at its hotels.

## CAUSES OF ACTION

### Cause of Action 1--Sexual Discrimination in
### Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1)

22.    Ms. deGersdorff incorporates the allegations of Paragraphs 1-21 as if fully set forth herein.

23.    Ritz-Carlton is an employer as defined in 42 U.S.C. §2000e(b).

24.    By subjecting Ms. deGersdorff to terms and conditions to which similarly situated male employees were not exposed, Ritz-Carlton unlawfully discriminated against Ms. deGersdorff on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(a)(1).

25.    Because of the unlawful acts of Ritz-Carlton, Plaintiff has suffered damages in the form of lost pay, loss incurred by her relocation to find new employment, as well as for mental anguish.

## Cause of Action 2--Attorneys' Fees

26.     Ms. deGersdorff incorporates the allegations of Paragraphs 1-21 as if fully set forth herein.

27.     Because of Ritz-Carlton's unlawful discrimination, Ms. deGersdorff has had to retain an attorney, and will be required to pay attorneys' fees.

28.     Ms. deGersdorff seeks an award of the attorney's fees she incurs in this lawsuit pursuant to 42 U.S.C. 200e(5)(k).

## RELIEF REQUESTED

29.     Based on the foregoing, Plaintiff Myra deGersdorff requests that the Defendant be cited to appear and answer this Complaint, and that upon trial of this lawsuit, that she be granted the following relief:

    a.   Compensatory and punitive damages in an amount to be determined at trial;

    b.   An award of costs and attorney's fees; and

    c.   All other relief to which she is justly entitled.


Respectfully Submitted:


/s/ Randall J. Meyer
RANDALL J. MEYER (18342)
Attorney at Law
337 Carondelet Street
New Orleans, LA 70130
(504) 523-0063
Randy@rmeyerlaw.com